IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


**STAREKEIZZA GOODWIN, on behalf of CH**　　　　　　　　**PLAINTIFF**

v.　　　　　　　NO. 4:21-cv-00375 PSH

**KILOLO KIJAKAZI, Acting Commissioner**　　　　　　　**DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER

Plaintiff Starekeizza Goodwin ("Goodwin"), on behalf of her minor daughter CH, challenges the denial of an application for supplemental security income payments. Goodwin does so on one ground. Goodwin maintains that CH's cerebral palsy, asthma, and speech delay, separately or in combination, meet, medically equal, or functionally equal a listed impairment, and the Administrative Law Judge ("ALJ") failed to so find. Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, his decision is affirmed.[1]

---

[1]　The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

CH was born on October 1, 2016. CH was twenty-nine months old on March 11, 2019, the day Goodwin filed an application for supplemental security income benefits on behalf of CH. In the application, Goodwin alleged that CH is disabled because of her cerebral palsy, asthma, and speech delay.

The record reflects that between March of 2018 and December of 2018, CH was seen on several occasions at a children's clinic for problems that included difficulties bearing weight on her right side and difficulties breathing.[2] For instance, CH presented to the clinic on April 18, 2018, for complaints that included wheezing. See Transcript at 237-239. CH's history of present illness was recorded to be as follows:

> Patient to be evaluated for wheezing. She thinks she wheezes, though she does not carry an official diagnosis of asthma. The frequency of daytime attacks averages several times per month. The frequency of nocturnal attacks averages several times per month. The current exacerbation began 3-4 days ago. Her current asthma medication includes albuterol MDI. In addition, she frequently uses antihistamines and oral steroids. Current asthma symptoms include progressive, nocturnal cough, ... and wheezing. [She] also uses an aerochamber with MDIs. ... Asthma triggers include weather changes and upper respiratory illnesses. The asthma has required hospitalization on multiple occasions (no intubation ever required). Positive for RSV mid February 2018. Has been to ACH multiple times with wheezing episodes.

---

[2] See Transcript at 240-241, 237-239, 235-236, 232-234, 230-231, 227-229, 224-225.

See Transcript at 237. Acute bronchiolitis was among the diagnoses. CH was continued on albuterol and an aerochamber, and medication that included prednisolone was prescribed.

On November 2, 2018, CH presented to the clinic for a well child check-up. See Transcript at 227-229. CH's "interval history" and "development" were recorded to be as follows:

> INTERVAL HISTORY: Significant illnesses or events since the last well visit include mother took [CH] to ACH ER about 2 weeks ago because she was refusing to bear weight and crying with her right leg. They did a MRI (she did fall from bunk bed 2 weeks ago and this prompted the visit as well). ACH told mother she had an old brain injury in the prenatal period and would need some PT to help with right leg dragging.
>
> DEVELOPMENT: In regard to motor skills, caregivers note that [CH] is able to alternate feet when ascending stairs, balance, kick a ball, open doors and simple household tasks. In regard to social and language skills, she does complete sentences and rhymes in familiar books, follow 2-step commands, say at least 50 words, imitate adults, know her name, age and gender and use 2-word phrases. ...

See Transcript at 227. A physical examination revealed that CH's gait/limbs were "affected by a right leg limp and almost drags the further she walks." See Transcript at 228. An abnormal gait was among the diagnoses. Physical and occupational therapy were recommended, and she was referred to "neurology to ensure this is an old brain injury ..." See Transcript at 229.

CH underwent MRI testing of her brain in the fall of 2018 at Arkansas Children's Hospital. The conclusions of the MRI testing were, in part, as follows:

> ... FLAIR hyperintensity is seen in the left centrum semiovale, lentiform nucleus, and internal capsule region without diffusion restriction. There is subtle wallerian degeneration in the corticospinal tract within the brainstem on the left side. A small focus of hyperintensity is seen within the right caudate nucleus. ...

See Transcript at 366.

CH was thereafter seen at Arkansas Children's Hospital on multiple occasions for her difficulties bearing weight on her right side and difficulties breathing.[3] For instance, a physical therapy outpatient evaluation of her was performed on November 12, 2018. See Transcript at 303-305. Her history of current problem included the following:

> ... [CH] was referred to physical therapy with concern for abnormal gait. Family reported that she walks with narrow gait and R leg "turned out" since she began walking at around 13 months old. They also reported she moved her right side less than her left side and would drag her right leg when she was crawling as well. She began to demonstrate early L hand preference. ...

---

[3]  See Transcript at 296-309, 268-295, 266-267, 261-265, 256-260, 471-477, 443-470, 441-442, 436-440, 431-435, 426-430.

4

See Transcript at 303. The attending physical therapist observed that CH was delayed in her gross motor development and demonstrated poor quality of gross motor skills due to weakness. The therapist opined that CH could benefit from "skilled PT intervention to address weakness in [her] right lower extremity and promote age-appropriate gait and gross motor development." See Transcript at 305.

An occupational therapy outpatient evaluation of CH was performed the same day. See Transcript at 306-309. She was observed to use her left upper extremity more than her right upper extremity but otherwise did not demonstrate a significant delay in the development of her fine motor skills. Occupational therapy was not recommended at that time.

On November 13, 2018, CH was seen at the Arkansas Children's Hospital Emergency Room for respiratory distress and fever. See Transcript at 296-302. The treatment notes reflects, in part, that she had been using an inhaler but with only minimal benefit. She had a history of bronchiolitis, and the episode was similar to previous episodes. Her condition improved with suctioning and medication, and she was discharged.

On December 18, 2018, CH was seen at the Arkansas Children's Hospital emergency room for her difficulties breathing. See Transcript at 268-269. Her condition was summarized as follows:

> 2 year old female, with PMH of bronchiolitis with multiple hospital admissions and recurrent wheezing, who presents for evaluation of respiratory distress. Patient has had a several day history of cough and congestion. Today she developed fever and was noted to have tachypnea and increased work of breathing. On physical exam, patient in severe respiratory distress, audible wheezing, tacky mucous membranes, poor airway entry with faint wheezing in all lung fields, tachypneic, subcostal and intercoastal retractions, tracheal tugging and nasal flaring. Given racemic epi x 1 and started on continuous albuterol. IV placed and given NS bolus. Magnesium ordered. . . .

<u>See</u> Transcript at 268. CH was admitted to the hospital where her condition was monitored. She was discharged the following day after her condition improved. She was continued on albuterol.

On March 28, 2019, CH was seen for a Developmental Evaluation at Kidsource Therapy. Her medical history was noted to be, in part, as follows:

> . . . [CH] was diagnosed with a brain injury that happened in utero in December 2018. She has also been diagnosed with Asthma. [CH] has been evaluated by Occupational Therapy and Physical Therapy at Arkansas Children's Hospital. She did qualify for Physical Therapy and went to 4 sessions of PT at ACH. Mom reports that she did not qualify for OT. [CH's] mom states that she is scheduled to see a neurologist at ACH on 4-1-19. [CH] has been hospitalized 9 times since her birth, she has not had any surgeries. [Her] frequent hospital stays were for Bronchiolitis. . . . Mom reports before her brain injury diagnosis that she woke up one morning and would only crawl she refused to walk. She was admitted to ACH and spent 4 days before being discharged with the traumatic brain injury diagnos[i]s.

See Transcript at 244. CH was found to have a delay in her gross motor skills, and she was referred for therapy. Although she did not show a twenty-five percent or greater delay in her fine motor skills, it was recommended that she receive an occupational therapy evaluation to assess those skills "due to the limited use of her right hand." See Transcript at 247. No delay in her expressive language was noted.

CH returned to Arkansas Children's Hospital on April 1, 2019, where she was seen for her right-side weakness by neurologist Dr. Bittu Majmudar, M.D. ("Majmudar"). See Transcript at 261-265. After reviewing the testing and examining her, he opined that the hypertonia/spasticity of her right upper extremity, her left hand preference, and her slight dragging of her right leg were likely secondary to signs of the chronic injury seen on her brain MRI. Majmudar recommended that CH continue physical therapy and that she be encouraged to use her right hand as much as possible. He observed that otherwise, she had a "normal/reassuring exam with normal development." See Transcript at 265.

On May 7, 2019, CH was seen at Kidsource Therapy for an assessment of her physical development. See Transcript at 387-392. CH's mother reported that CH preferred to use her left hand and would only use her right hand with cues. An occupational therapist opined that CH had a

"delay in the development of fine motor skills and [right upper extremity] strength and coordination based on her age of [thirty] months." See Transcript at 391. The therapist observed that CH would benefit from occupational therapy to develop and strengthen her right upper extremity.

On October 1, 2019, CH was seen by Majmudar for a follow-up examination. See Transcript at 426-430. He noted that she had right hemiplegic cerebral palsy from a presumed prior perinatal injury, but she had shown improvement as a result of therapy. He observed that she had good use of her right hand, and she was not dragging her right leg when walking. He recommended continued therapy and that she be encouraged to use her right arm and right leg at home. He concluded the progress note by offering the following observation: "Otherwise, she is noted to have a reassuring exam and normal development other than some speech articulation issues. As she is doing very well, advised that next follow-up can be in 1 yr, but to call the office if any concerns noted in the meantime and can re-examine sooner if needed." See Transcript at 429.

On October 25, 2019, CH was evaluated at Dawson Education Services Cooperative for possible placement in speech language services as a result of her articulation deficits. See Transcript at 517-529. She was approved for services on the basis of the following finding:

> Based on standardized testing results, [CH's] expressive and receptive language, voice and fluency are all within normal limits. She does present with deficits in articulation characterized by multiple omissions, substitutions and distortions that affect her ability to effectively communicate with peers and teachers and participate successfully in the classroom setting. These errors can also affect her pre-reading skills needed for kindergarten readiness.

See Transcript at 521.

State agency medical consultants Dr. Susan Manley, M.D., and Dr. John Giblin, M.D., reviewed the record in this case. See Transcript at 53-60, 62-72. They agreed that CH has no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. They agreed that CH has less than marked limitations in her ability to move about and manipulate objects and with health and physical well-being. They also agreed that although CH has medically determinable impairments, her impairments do not meet or equal a listed impairment.

Goodwin testified on CH's behalf during the administrative hearing. See Transcript at 37-49. CH's primary problem is that she falls frequently. Her brain injury is on the left side of her brain and affects the right side of her body. Goodwin was asked how CH's brain injury affects her right side, and Goodwin testified as follows:

> ... She has problems grasping things and like her right leg is outward. It goes outward and it's extremely slanted. Like when she's sitting down, she sits in a W and we have to constantly, you know, remind her, ..., straighten your legs out, or I have to actually get her leg and move it to straighten it out.

See Transcript at 38. CH drags her right foot when she walks and runs, which oftentimes causes her to fall. She has difficulty grasping objects with her right hand, which appears to be her dominant hand. Physical therapy, though, has improved her use of her right hand. CH has pain in her chest caused by asthma and experiences difficulties breathing, on average, five times a month.

The ALJ used a three-step sequential evaluation process to review the application Goodwin filed on behalf of CH.[4] The ALJ found at step two that CH has severe impairments in the form of cerebral palsy, asthma, and speech delay. At step three, the ALJ found that CH does not have an

---

[4] In a minor child disability case, the ALJ is required to follow a three-step sequential evaluation process. See Meux on behalf of Foster v. Kijakazi, No. 2:20-cv-188-BSM-JTR, 2021 WL 5566798 (E.D. Ark. Nov. 29, 2021), report and recommendation adopted sub nom. Meux v. Social Security Administration, No. 2:20-cv-00188-BSM, 2022 WL 824401 (E.D. Ark. Mar. 17, 2022). The second and third steps require the ALJ to determine if the child has a severe impairment or combination of impairments and, if so, whether it meets, medically equals, or functionally equals a listed impairment. "For medical equivalence, the ALJ refers to the Child Listing of Impairments in Disability Evaluation," which is "an index of medical conditions and the signs or symptoms required for a minor to meet a Listing." See Id. at 1. "For functional equivalence, a minor has met a Listing if his impairment or combination of impairments results in a 'marked' limitation in two domains of functioning, or an 'extreme' limitation in one domain [of functioning]." See Id.

impairment, or combination of impairments, that meets, medically equals, or functionally equals a listed impairment. The ALJ concluded that CH has not been disabled for purposes of the Social Security Act since March 11, 2019, the day Goodwin filed the application.

Goodwin challenges the ALJ's findings on the ground that CH's cerebral palsy, asthma, and speech delay, separately or in combination, meet, medically equal, or functionally equal a listed impairment. Specifically, Goodwin maintains that CH's cerebral palsy meets, medically equals, or functionally equals Listing 111.07; her asthma meets, medically equals, or functionally equals Listing 103.03; and her speech delay meets, medically equals, or functionally equals Listing 102.00(B)(5).

Cerebral Palsy. The listings within 111.00 encompass childhood neurological disorders. Listing 111.07 encompasses cerebral palsy, characterized by disorganization of motor function in two extremities, resulting in an "extreme" limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

The ALJ found that CH's cerebral palsy does not meet or medically equal Listing 111.07. The ALJ found that although CH's right arm and right leg were affected by a perinatal brain injury, CH's ability to use her right arm and right leg improved with physical therapy. See Transcript at 15.

Substantial evidence on the record as a whole supports the ALJ's finding. Without question, CH's right arm and right leg are affected by a perinatal brain injury. Her use of her right arm and right leg, though, improved with therapy. For instance, Majmudar's October 1, 2019, progress note reflects that "[CH] has been receiving therapy services, with which she has shown improvement and exam is noted to be much improved compared to previously with good use of the right hand and no dragging of right leg noted when walking." See Transcript at 426. Goodwin even acknowledged during the administrative hearing that CH's use of her right hand improved with therapy. See Transcript at 41. The ALJ could therefore find that CH's cerebral palsy, characterized by disorganization of motor function in two extremities, does not result in an "extreme" limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.[5] Having found as such, the ALJ could and did find that CH's cerebral palsy does not meet or medically equal Listing 111.07.

---

[5] Listing 111.00D2 provides that "extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete age-appropriate activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders)."

Asthma. The listings within 103.00 encompass childhood respiratory disorders. Listing 103.03 encompasses asthma "with exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart ...," and the twelve month period must occur within the period under consideration. The listing additionally requires that "[e]ach hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization."

The ALJ found that CH's asthma does not meet or medically equal Listing 103.03. The ALJ so found because CH's asthma is mild and is treated with inhalers, as needed. See Transcript at 15.

Substantial evidence on the record as a whole supports the ALJ's finding. It is debatable whether CH's asthma is mild, although it was once characterized as such. See Transcript at 484. Her asthma is nevertheless controlled with relatively routine treatment such as inhalers and albuterol. CH has been hospitalized for asthma, or asthma-like symptoms, but the hospitalizations occurred before March 11, 2019, the day Goodwin filed the application. The hospitalizations are therefore "outside the relevant period." See Docket Entry 16 at CM/ECF 6. Moreover, the hospitalizations did not last at least forty-eight hours. The ALJ could and did therefore find that CH's asthma does not meet or medically equal Listing 103.03.

Speech delay. The listings within 102.00 encompass, in part, childhood speech. Listing 102.00(B)(5) does not appear to be an independent listing but rather offers explanations of certain terms. Listing 102.00(B)(5) describes what is meant by a "marked" limitation in speech. A "marked" limitation means, in part, entire phrases or sentences are intelligible to unfamiliar listeners at least fifty percent of the time but no more than two-thirds of the time on a first attempt, and sound production or phonological patterns are atypical for a claimant's age.

The ALJ appears to have found Listing 102.00(B)(5) to be an independent listing. The ALJ found that CH's speech delay does not meet or medically equal Listing 102.00(B)(5). The ALJ so found because "[CH] attends speech therapy, due to a deficit in articulation that affected her ability to communicate, but there is no indication that her speech impairment rises to listing level ..." See Transcript at 15.

Setting aside whether Listing 102.00(B)(5) is indeed an independent listing, substantial evidence on the record as a whole supports the ALJ's finding. CH has deficits in speech articulation characterized by omissions, substitutions and distortions. An evaluation at Dawson Education Services Cooperative revealed, though, that her expressive and receptive language, voice, and fluency are all within normal limits. There is little to suggest

that she has a "marked" limitation in speech, i.e., entire phrases or sentences are intelligible to unfamiliar listeners at least fifty percent of the time but no more than two-thirds of the time on a first attempt, and her sound production or phonological patterns are atypical for her age. The ALJ could and did therefore find that CH's speech delay does not meet or medically equal Listing 102.00(B)(5).

Functional equivalency. If a child claimant has a severe impairment, or combination of impairments, that does not meet or medically equal a listed impairment, the ALJ must determine if the child has an impairment, or combination of impairments, that functionally equals a listed impairment. See Lillard v. Berryhill, 376 F.Supp.3d 963 (E.D. Mo. 2019). In order to functionally equal a listed impairment, the child's impairments must result in a "marked" limitation in two domains of functioning, or an "extreme" limitation in one domain. See Id. at 977.[6] The six domains are "1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Yourself; and 6) Health and Physical Well-Being." See Id. Limitations are "marked" or "extreme" in the following instances:

---

[6] The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." See Lillard v. Berryhill, 376 F.Supp.3d at 977 (quoting 20 C.F.R. 416.926a(b)(1)).

A child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. 416.926a(e)(2)(i). A child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner must review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. 416.926a(f)(1); see also 20 C.F.R. 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. 416.924a(b)(5). For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting. 20 C.F.R. 416.924a(b)(5)(iv).

See Id.

The ALJ properly noted his obligation to consider whether CH has an impairment, or combination of impairments, that "functionally equals the listings." See Transcript at 15-16. The ALJ identified the six domains, thoroughly reviewed the evidence of record, and applied the evidence to the domains. See Transcript at 17-27. The ALJ found that CH has no limitation in acquiring and using information, no limitation in attending and completing tasks, less than a "marked" limitation in interacting and relating with others, less than a "marked" limitation in moving about and manipulating objects, no limitation in the ability to care for herself, and less than a "marked" limitation in health and physical well-being. The ALJ therefore found that CH does not have an impairment, or combination of impairments, that functionally equals a listed impairment.

Substantial evidence on the record as a whole supports the ALJ's finding. The ALJ could and did find that CH does not have an impairment, or combination of impairments, functionally equaling the listings as she does not have a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain.

First, the ALJ could find that CH has no limitation in acquiring and using information. Goodwin represented in a Child Function Report that CH has no difficulty understanding and learning. See Transcript at 149.

Second, the ALJ could find that CH has no limitation in attending and completing tasks. Although Majmudar stated that he could not complete motor strength testing of CH because of her lack of cooperation, see Transcript at 264, Shanda Vison, APRN, found that CH could complete sentences and rhymes in familiar books; follow two-step commands; say at least fifty words; imitate adults; knew her name, age and gender; and use two-word phrases, see Transcript at 227.

Third, the ALJ could find that CH has less than a "marked" limitation in interacting and relating with others. Goodwin represented in a Child Function Report that CH does not play well with other children, but CH is able to play with her sisters. See Transcript at 151. Although CH has deficits in speech articulation characterized by omissions, substitutions and distortions, her expressive and receptive language, voice, and fluency are all within normal limits. See Transcript at 521.

Fourth, the ALJ could find that CH has less than a "marked" limitation in moving about and manipulating objects. Clearly, CH has had some difficulty using her right arm and right leg as a result of a perinatal brain injury. In an October 1, 2019, progress note, though, Majmudar observed that CH had good use of her right hand and was no longer dragging her right leg when she walked. See Transcript at 426.

Fifth, the ALJ could find that CH has no limitation in caring for herself. Goodwin represented in the Child Function Report that CH has no difficulty helping with her personal needs. See Transcript at 151.

Last, the ALJ could find that CH has less than a "marked" limitation in health and physical well-being. CH's right arm and right leg impairment has improved with therapy, her asthma improves with appropriate treatment, and the evidence of her speech delay is somewhat inconsistent.

The Court derives no pleasure from affirming the ALJ as CH clearly has impairments that impact her life. It is not the role of the Court, though, to re-weigh the evidence and, even if this Court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). Here, the evidence is capable of more than one acceptable characterization, and the ALJ could find as he did with respect to CH's impairments.

Accordingly, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Goodwin's complaint filed on behalf of CH is dismissed, all requested relief is denied, and judgment will be entered for the Acting Commissioner of the Social Security Administration.

IT IS SO ORDERED this 14th day of April, 2022.

_____
UNITED STATES MAGISTRATE JUDGE